# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        Plaintiff,

  v.                                                                                 **Case No. 11-CR-284**

**DAN SHIPP**
        **Defendant.**

## DECISION AND ORDER

The government charged defendant Dan Shipp with possessing firearms as a felon. Defendant moved to suppress evidence obtained by the police following a traffic stop, arguing that the police lacked reasonable suspicion or probable cause to pull him over, as the officer's claimed basis for the stop (a defective brake light and seatbelt violations) lacked credibility; even if the initial stop was lawful, he claimed that the police unreasonably prolonged the encounter by seeking consent to search for drugs and unlawfully patted him down prior to placing him in a locked squad car during a consent search of his vehicle.

The magistrate judge handling pre-trial proceedings in this case held an evidentiary hearing, then issued a recommendation that the motion be denied. She credited the officer's testimony that defendant's vehicle had a defective brake light, and that defendant and his passenger were not wearing their seatbelts. She further found that the brief extension of the stop while the officers sought and obtained consent to search did not unreasonably prolong the encounter. Finally, the magistrate judge determined that the officers reasonably patted defendant down for their own safety prior to placing him in the squad (otherwise unrestrained) during the vehicle search.

Defendant objects to the recommendation. The district court reviews de novo those portions of a magistrate judge's recommendation to which specific objection is made. See 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b); United States v. O'Neill, 27 F. Supp. 2d 1121, 1126 (E.D. Wis. 1998). De novo review does not require a de novo evidentiary hearing, even when witness credibility is at issue. See United States v. Raddatz, 447 U.S. 667, 673-76 (1980). Neither side requests a de novo hearing in this case, and I find the record made before the magistrate judge sufficient for me to rule.[1]

**I.**

Defendant does not specifically object to the magistrate judge's summary of the testimony from the evidentiary hearing. Rather, he argues that the magistrate judge erred in her credibility determination regarding the reason for the stop. I therefore adopt the magistrate judge's statement of facts (Recommendation [R. 33] at 2-7) and present an abbreviated version of the testimony here.

Milwaukee Police Officer William Baker testified that on October 13, 2011, he and his partner were investigating a drug complaint at defendant's apartment. After a brief period of surveillance (about fifteen minutes), the officers saw a man and woman drive out of the parking

---

[1]In his objections, defendant specifically addresses only the magistrate judge's conclusion on the legality of the traffic stop. I therefore focus on that issue in this decision. Defendant does state at the outset of his objections that he also relies on the arguments made in his initial and reply memoranda before the magistrate judge. (Def.'s Objec. [R. 38] at 1.) However, de novo review "is required only for those portions of the recommendation for which particularized objections, accompanied by legal authority and argument in support of the objections, are made." Banta Corp. v. Hunter Publ'g Ltd., 915 F. Supp. 80, 81 (E.D. Wis. 1995). A general statement that a party "objects" or incorporates arguments previously made to the magistrate judge will not suffice. O'Neill, 27 F. Supp. 2d at 1126 (citing United States v. Molinaro, 683 F. Supp. 205, 211 (E.D. Wis. 1988)); see also Thomas v. Arn, 474 U.S. 140, 148-55 (1985); United States v. Hall, 462 F.3d 684, 688 (7th Cir. 2006).

2

lot in a light blue mini-van associated with defendant. Although he wasn't sure the man was defendant, Baker testified that he wanted to speak to the occupants of the vehicle. Baker testified that neither occupant wore a seatbelt, and that when the vehicle stopped at a nearby intersection he observed that the rear passenger side brake lamp did not illuminate. The officers pulled the vehicle over, Baker approached, advised the driver why he had stopped them, and requested identification; the officers then conducted license and warrant checks. The driver (defendant) came back clean, but the passenger had a warrant from another jurisdiction. Baker approached the vehicle and asked for permission to search for drugs or guns, and defendant consented. Baker testified that about two or three minutes elapsed between the time of the stop and his request for consent.

After getting consent to search, the officers removed defendant and the passenger from the vehicle, placing defendant in Baker's squad and the passenger in a second squad in order to shield them from the rain. Before placing defendant in the car, Baker asked him to raise his hands and patted him down for weapons (finding nothing). Baker then searched the vehicle, which took about five minutes, locating a clear plastic bag of suspected cocaine. Baker returned to his squad car and notified defendant of his discovery; defendant admitted that the drugs belonged to him. Baker then informed defendant of the narcotics complaint for his residence, and defendant denied being a drug dealer. Baker then requested consent to search defendant's house for narcotics, and defendant agreed, signing Baker's memo book to memorialize the consent. Baker testified that this conversation lasted one or two minutes, and that about ten minutes total elapsed between the initial stop and the time defendant consented to the search of his home. Baker then searched the apartment, locating drug paraphernalia and two firearms.

Defendant testified that he and his passenger wore their seatbelts while the vehicle was in motion (the passenger removed her's only after they stopped), and that his brake lights worked. However, he admitted that, upon approaching the vehicle, Baker told him that the passenger was not wearing her seatbelt, and that the top brake light in the rear windshield was not working properly. Defendant testified that Baker said the light wasn't a problem, and that the real reason for the stop was a drug complaint. Defendant further testified that it took the officers about fifteen minutes to run license and wanted checks, after which Baker asked him to step out of the vehicle and requested consent to search. Defendant testified that he consented to the search, and that he and the passenger stood under a tree while Baker checked the car.

Victor Jackson, an investigator for Federal Defender Services, testified that on January 23, 2012, he checked defendant's vehicle and determined that the tail lamps worked properly; he took confirming photos of the van with the brake lights on. (Evid. Hr'g Ex. 13-15.) Defendant's cousin, Larry Shipp, testified that he took possession of defendant's van about a week after defendant's arrest. He testified that he checked out the vehicle before he agreed to buy it, that the tail and brake lights worked properly, and that he had not performed any repairs to the lights.

**II.**

A traffic stop is reasonable if the police have probable cause to believe that a traffic violation has occurred. E.g., United States v. Muriel, 418 F.3d 720, 724 (7th Cir. 2005) (citing Whren v. United States, 517 U.S. 806, 810 (1996)). This is so even if the traffic stop serves as a pretext to permit the police to investigate some other crime. See, e.g., Whren, 517 U.S. at 813; United States v. Hernandez-Rivas, 348 F.3d 595, 599 (7th Cir. 2003). "Probable cause

exists when 'the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense.'" Muriel, 418 F.3d at 724 (quoting United States v. Cashman, 216 F.3d 582, 586 (7th Cir. 2000)). The issue for the court is only whether the officer had probable cause to believe that a traffic violation occurred, not whether the violation actually occurred. See Muriel, 418 F.3d at 724; see also Cashman, 216 F.3d at 587 ("The propriety of the traffic stop does not depend, in other words, on whether Cashman was actually guilty of committing a traffic offense by driving a vehicle with an excessively cracked windshield. The pertinent question instead is whether it was reasonable for Trooper Spetz to believe that the windshield was cracked to an impermissible degree."); United States v. Dexter, 165 F.3d 1120, 1124 (7th Cir. 1999) (holding that even if the van in which the defendant was riding was not in violation of the traffic laws at the time the trooper stopped it, the stop was justified if the trooper had probable cause to believe a violation had occurred).

Wisconsin traffic law requires that a vehicle have two working stop lamps and that a driver and passenger wear seatbelts. See Wis. Stat. § 347.14(1); Wis. Stat. § 347.48(2m). Baker testified that he pulled defendant over for violating these provisions; defendant claims that his brake lights worked and that he and his passenger wore their belts. As the magistrate judge recognized, resolution of this issue presents a credibility contest.

The magistrate judge credited Baker's version, and on de novo review I do as well. First, the magistrate judge relied on body language and demeanor to find Baker credible, and I am provided no reason to disagree with her evaluation.[2] Second, as the magistrate judge explained, Baker's credibility is enhanced by the fact that he did not attempt to "stretch" his

---

[2]As noted above, defendant does not request a de novo hearing.

testimony: he admitted that the traffic stop was a pretext, that he was not certain defendant was the driver of the vehicle, that he observed no suspicious activities during surveillance, and that defendant did not behave suspiciously once pulled over.

It is true that in his police report Baker wrote that he stopped the vehicle due to a defective "tail lamp" rather than a "brake lamp." (Evid. Hr'g Ex. 7 at 4, 8.) However, Baker reasonably testified that while there is technically a difference between the two under the traffic code, the physical lamp is the same, and he uses the terms interchangeably.[3] Further, defendant's admission that Baker mentioned a defective brake lamp when he initially approached the vehicle supports the notion that Baker was not making this up after the fact to support the stop.[4] It is also true that the pictures of the vehicle taken by Jackson show that the brake lights work. However, those pictures were taken several months after the stop and may

---

[3]In fact, he used them interchangeably at the hearing:

Q. Did you make any -- did anything appear unusual as you observed that vehicle proceeding in that direction?

A. Yes. When he exited the parking lot I observed neither him or his passenger was wearing a seatbelt. Then, as they made the turn and stopped at West National Avenue, I observed his defective tail lamp as he applied his brakes to the car.

Q. Now, you said you observed a defective brake light?

A. I said tail lamp, but stop lamp. The physical lamp is the same. When you apply the brake on a car the lamp illuminates so it becomes brighter. And the passenger side of his vehicle, that lamp didn't become brighter as the brake was applied. So the driver's side of his vehicle, the brake, the lamp, the stop lamp became brighter, but on the passenger side it did not.

(Excerpt Tr. [R. 23] at 13.)

[4]Defendant testified that Baker referred to the third, "high mount" brake lamp, but the photos of the van show no such lamp. (Evid. Hr'g Ex. 1-2, 13-15.)

6

not accurately reflect how things appeared on the date in question.[5]  Finally, while Baker did not mention the seatbelt violation in the probable cause statement (Evid. Hr'g Ex. 11 at 1) and initial abbreviated report (Evid. Hrg. Ex. 7 at 4) prepared on October 13, he did include it in the supplement/narrative report he prepared a day or two later (Evid. Hr'g Ex. 7 at 8; see also R. 23 at 47-48).  And, as with the brake light issue, defendant admitted that Baker mentioned the passenger's seatbelt during the initial encounter, which rebuts the notion that this was a recent fabrication designed to bolster the stop.

As the magistrate judge thoroughly explained, defendant's testimony, on the other hand, was at times confusing and overall less reliable than Baker's.  For instance, it seems highly unlikely that Baker would have told defendant, during the initial encounter – and before verifying that the driver of the van was, in fact, Dan Shipp – that the real reason for the stop was a drug complaint, as defendant claimed.  It is also unconvincing to claim that the passenger took her belt off only after the stop; as the magistrate judge explained, it would be more reasonable to leave it on to make sure that the police officer got a good view of her with the seatbelt on.  Defendant also seemed to have significant trouble describing the basic layout of the area.  (Hr'g Tr. [R. 31] at 24-25.)

In his objections, defendant argues that Baker's motive for the stop casts doubt on his credibility.  (R. 38 at 2.)  However, Baker forthrightly admitted that he wanted to speak to defendant about the drug complaint, and that the traffic stop provided a basis for him to do so.

Defendant further argues that Baker's police report suggests that the officers saw a

---

[5] Baker also took photos of the vehicle, which showed that the tail lights worked; however, the brakes were not applied in those pictures so they do not directly address the issue.  (Evid. Hr'g Ex. 1-2; R. 23 at 16.)

7

defective "tail lamp" while traveling behind defendant's moving vehicle, which casts doubt on Baker's testimony that he saw a defective brake lamp when defendant stopped at the intersection. (R. 38 at 2.) The report may be open to different interpretations, but it does not clearly support defendant's position. In the supplement/narrative section, Baker wrote: "[My partner] drove our marked Milwaukee Police squad directly behind the light blue Dodge van on the 2200 block of W National Av. I observed the light blue Dodge van had a defective passenger side tail lamp and the occupants were not [wearing] seat belts." (Evid. Hr'g Ex. 7 at 8; see also R. 23 at 55.) The report does not say when or where Baker saw the defective light; Baker's testimony that he saw the light when defendant stopped at the intersection of 22nd Street and National Avenue is therefore not inconsistent with the report. (See R. 23 at 58.) Nor does the report indicate precisely when Baker saw the seatbelt violation; thus, the report is not inconsistent with Baker's testimony that he saw the seatbelt violation as defendant exited the parking lot. (See R. 23 at 13.)

Defendant further argues that Baker's explanation that he uses "tail lamp" interchangeably with "brake lamp" is not persuasive; he argues that the difference is one that every officer and most citizens recognize. (R. 38 at 3.) However, Baker is a member of the department's gang unit; it is not surprising that he would be less well-versed in the minutia of the traffic code. In his reply in support of the objections, defendant contends that Baker did not realize at the time he wrote his report that his own photographs of the van demonstrated that the tail lamps were in perfect working order; he therefore had to change his story for the hearing and claim that it was the brake lights that didn't work. (R. 43 at 1-2.) But Baker surely knew when he wrote his report that the tail lights worked; he had seen them with his own eyes; he did not need the pictures. Further, this argument assumes that no reasonable officer could

8

use the terms "tail light" and "brake light" interchangeably; as discussed, I reject that contention.

Defendant argues that, regardless of the terminology Baker used, both the tail and stop lamps were fully operational. He points to the photos taken by defense investigator Jackson and the testimony from Larry Shipp. (R. 38 at 3.) However, as indicated above, Jackson took the photos several months after the traffic stop. Defendant argues that there is no reason to reject Larry Shipp's testimony, but as defendant's cousin he may have a motive to slant his testimony in defendant's favor. Larry Shipp further admitted that he was "[n]ot too familiar" with the tail light assembly of the vehicle. (R. 31 at 59.)

Regarding the seat belt violation, defendant notes that Baker's initial report made no mention of any such violation. (R. 38 at 3.) However, Baker did include this violation in the supplement/narrative report. Defendant contends that he and his passenger were wearing their seatbelts, and that Baker's observation of the seatbelts was made only after the stop when they had removed their belts. (R. 38 at 3.) But I agree with the magistrate judge that it would make little sense for defendant or his passenger to remove their belts as they awaited the officers' approach, and Baker got a good look at the occupants of the van at they left the parking lot.[6]

Finally, the record does not support defendant's contention that Baker, so frustrated by his inability to speak with defendant after a prolonged drug investigation, would manufacture two traffic violations. (R. 38 at 4; R. 43 at 3.) The complaint about defendant's drug trafficking

---

[6]In his reply, defendant concedes that his testimony was at times confused, which he attributes to mental illness. He argues that his difficulty testifying reflected not on his honesty but on his somewhat limited abilities. (R. 43 at 2-3.) A fact-finder may, in evaluating the reliability of a witness's testimony, consider his apparent confusion about key factual matters. This does not necessarily mean that the witness is lying, only that his testimony deserves less weight because it is unreliable.

came in on September 19, 2011 (Evid. Hr'g Ex. at 5), and Baker testified that it was relayed to him in late September (R. 23 at 4); the record contains no evidence suggesting that Baker had expended so much time on the matter that by October 13, 2011, he would be willing to invent a reason for a traffic stop just to talk to defendant. Baker testified that after receiving the complaint he ran vehicle and record checks, and went by the apartment building three or four times to try to speak to defendant. (R. 23 at 4-5.) He knocked on the door once; on the other occasions he simply looked to see if it appeared anyone was home while he patrolled the area. (R. 23 at 32.) He did not speak to the complainant. (R. 23 at 34.) This hardly qualifies as a prolonged or intensive investigation. Further, as Baker testified, he was not even sure that the driver of the minivan he followed was defendant. Nor is there any evidence that defendant was in the process of leaving town on October 13, 2011, such that Baker had to pull him over right away (with or without justification) rather than risk him slipping away, as defendant suggests. (R. 43 at 3.)

In his reply brief, defendant sets forth his theory of what happened: As Baker pulled the van over, he noted that the "third brake light" – the high mount stop lamp – did not illuminate. Baker told defendant that the third brake light didn't work, but that it was "all right" (because Wisconsin law does not require a working third brake light). Nevertheless, defendant contends, Baker likely seized on that observation of the third brake light to make his claim regarding the tail lamp. (R. 43 at 3-4.) Defendant's theory breaks down, however, because the photos and the testimony indicate that the van had no third brake light. (Evid. Hr'g Ex. 1-2, 13-15; R. 31 at 38, 59.) Defendant continues that, during the initial conversation, Baker also told defendant that his passenger wasn't wearing a seatbelt, but defendant explained that his passenger had just taken off her seatbelt. (R. 43 at 4.) As discussed, I find that this makes little sense.

10

Defendant also claims that Baker told him during the initial discussion that he was conducting a drug investigation. (R. 43 at 4.) As also discussed, it would be odd for Baker to make such a disclosure at that early point in the encounter, before he had even confirmed the identity of the driver. Defendant contends that, after Baker returned to the police department that evening, he wrote his initial report identifying an inoperable tail lamp as the basis for the stop. But Baker overlooked that he had taken photos of the vehicle showing that the tail lamps worked perfectly. (R. 43 at 4.) But Baker did not need the photos to know that the tail lights worked; he had seen them. A more plausible explanation is that Baker used tail and brake light interchangeably, not that he had to find a way to cover his tracks after the photos were developed. Defendant contends that Baker added in his later report a claimed seatbelt violation, which he observed only after he stopped defendant's vehicle. (R. 43 at 4.) But defendant offers no good reason why Baker would have to add anything to the supplement he prepared shortly after the stop (a day or two later). Nor do I accept the contention that Baker observed the seatbelt violation only after the stop. As the magistrate judge explained, Baker was well positioned to observe this violation while the vehicle was in motion. (R. 33 at 14.) Defendant notes that the defense investigation showed that the stop lamps worked, and the government provided no evidence that anyone had fixed them between October 2011 and January 2012. (R. 43 at 4.) However, Baker testified that he is aware that sometimes a vehicle can have a momentarily defective brake light, which if "jiggled. . . goes back into a functioning mode." (R. 23 at 16.) Ultimately, the issue here is only whether the officer reasonably and credibly believed a brake light violation occurred, not whether the lights actually worked. I agree with the magistrate judge that Baker so believed.

  In sum, I find Baker's account more credible. On de novo review, I concur with the

11

magistrate judge that the initial stop was lawful. Accordingly, there is no basis for suppressing the evidence and statements collected thereafter.[7]

**III.**

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 33) is adopted, and defendant's motion to suppress (R. 10) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 21st day of June, 2012.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

---

[7] As indicated, defendant does not in his objections specifically address the magistrate judge's conclusions regarding the length of the stop and the pat-down. He has therefore waived de novo review, and I adopt the magistrate judge's recommendation on those issues. As the magistrate judge explained, Baker's request for consent did not unreasonably extend the stop. See United States v. Childs, 277 F.3d 947, 951-52 (7th Cir. 2002) (holding that questions put to a person during a traffic stop need not be related to the purpose of the stop and do not require reasonable suspicion or probable cause, so long as the entire encounter remains reasonable); see also United States v. Burton, 334 F.3d 514, 518-19 (6th Cir. 2003) (holding that asking for consent to search did not unreasonably extend the scope of a traffic stop). Nor did the officers act unreasonably in asking defendant to raise his hands and patting him down for their safety prior to placing him, un-cuffed, in the squad car (to protect him from the rain) during the search of his car. In any event, the officers located no evidence through this pat-down, which did not materially alter the nature and duration of the encounter.

12